IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| v. | ) 2:19-cr-8 |
| DASHAWN BURLEY and OMARI PATTON, | ) |
| Defendants. | ) |

# MEMORANDUM OPINION

Defendant Dashawn Burley was indicted for his alleged involvement in a conspiracy to distribute drug-soaked paper disguised as legal mail in prisons. [ECF 501; ECF 1879, p. 33]. One of Mr. Burley's co-defendants is his father, Omari Patton. [ECF 501].

Mr. Burley moves to suppress all evidence obtained from a warrantless search of his bedroom in the apartment he shared with his mother and stepmother. [ECF 1761]. His stepmother consented to that search. Mr. Burley argues that this consent was invalid and therefore law enforcement violated his Fourth Amendment rights when it conducted the search. Mr. Patton seeks to join in Mr. Burley's motion. Mr. Patton believes he has standing because one of the items seized was a mailing envelope that was addressed to him.

On July 8, 2020, the Court held an evidentiary hearing on Mr. Burley's motion during which the parties examined witnesses, entered exhibits into evidence, and made oral argument.

After carefully considering the evidence and argument presented to the Court, the Court will deny the motion to suppress. In short, the government has proven by a preponderance of the evidence that Mr. Burley's stepmother voluntarily consented to the search of his bedroom and that she had the authority to do so.

## **FACTUAL FINDINGS**[1]

On January 10, 2019, at about 5:00 a.m., the Drug Enforcement Administration, the United States Marshals Service, the Pennsylvania Attorney General's Office, and the United States Postal Service were jointly tasked with executing an arrest warrant for Mr. Burley at 4150 Ivanhoe Drive, Apartment B9, Monroeville, Pennsylvania 15146. [ECF 2178-1, p. 1]. Mr. Burley was 20-years old at the time and lived with his mother and his mother's wife (*i.e.,* his stepmother).

At about 6:00 a.m., the law-enforcement agents knocked on the front door of the apartment and announced themselves. [*Id.* at p. 2]. A few minutes later, Mr. Burley answered the door and the agents placed him into custody. [*Id.*]. The agents entered the apartment with flashlights and weapons drawn. [Transcript of the July 8, 2020 Suppression Hearing ("Hearing Tr."), 8:3-5].

Once inside, the agents found Camille Turner, Mr. Burley's stepmother, exiting her bedroom in the hallway. [*Id.*]. Ms. Turner was dressed in a t-shirt and basketball shorts. [*Id.* at 12:19]. A few agents stayed with Ms. Turner in the living room while the remaining agents conducted a protective sweep of the apartment. [ECF 2178-1, p. 2]. During this protective sweep, USPS Agent Steve Celletti and Task Force Officer Renjienico Manday observed in plain view a sealed white envelope addressed to Omari Patton with "SPECIAL MAIL OPEN ONLY IN THE PRESENCE OF THE INMATE" stamped on the front. [*Id.*]. The agents believed this envelope to be incriminating evidence. [Hearing Tr. at 59:23-60:2]. Once the protective sweep was over, the agents holstered

---

[1] These factual findings are based on the testimony and evidence provided at the suppression hearing. Camille Turner and Agent Jim Embree of the Pennsylvania Attorney General's Office testified at the hearing.

their weapons and did not point them at anybody else in the apartment. [*Id.* at 68:11-17].

After the agents found the envelope, Officer Manday and Agent Jim Embree interviewed Ms. Turner about whether she would consent to a search of the rest of the apartment, including Mr. Burley's bedroom. *See* [ECF 2178-1, p. 2; Hearing Tr. at 45:2-4]. At the start of this interview, Ms. Turner was told that she was not in custody. [Hearing Tr. at 44:5-7]. Ms. Turner was not handcuffed [*id.* at 43:24-5] or physically restrained in any other way [*id.* at 45:12-13]. The agents did not yell at her or threaten to arrest her at any point. [*Id.* at 45:14-17].

According to Ms. Turner, the interview occurred at a "normal conversation distance." [*Id.* at 14:25-15:1]. Although Ms. Turner claimed she was "nervous and frightened" on the inside, she appeared calm on the outside. [*Id.* at 30:2-7]. Consistent with her self-assessment, Agent Embree also observed that Ms. Turner had a very calm emotional state throughout their interaction. [*Id.* at 45:22-23].

Ms. Turner told the agents that she was the leaseholder of the apartment. [*Id.* at 47:5-6]. According to the agents, Ms. Turner represented that none of the rooms, including Mr. Burley's bedroom, were "off limits" to her. [ECF 2178-1, p. 2]. While there was a lock on the door, the lock was part of a standard bedroom doorknob that locks from the inside and there was no testimony that a separate key was needed to unlock it. [Hearing Tr. at 25:4-12]. In any event, Ms. Turner testified that Mr. Burley did not lock the door [*id.* at 25:6-7], and that if she wanted to "go in" Mr. Burley's room, she "could have" [*id.* at 34:5].

The agents also claim that Ms. Turner told them that Mr. Burley did not pay rent during their interview. [ECF 2178-1, p. 2; Hearing Tr. at 47:4-5]. Ms.

Turner disputes that claim; she testified she never would have said that because Mr. Burley did pay rent from time-to-time. [Hearing Tr. at 26:5-7]. To the extent that Mr. Burley did pay rent, Ms. Turner described that arrangement as "informal," with Mr. Burley paying what he could, when he could. [*Id.* at 32:14-24].

Ms. Turner verbally consented to a search of the entire apartment during this exchange. [*Id.* at 14:7-9]. After she gave verbal consent, the agents had her sign a one-page written form to memorialize that consent. [*Id.* at 14:10-12; ECF 2178-2]. The agents read that form to Ms. Turner before she signed it. [Hearing Tr. at 26:18-21]. As a college graduate and business owner, Ms. Turner gave no indication that she experienced any difficulty understanding the form. [*Id.* at 6:20-22]. Ms. Turner signed the form within approximately 10 to 15 minutes of the front door being opened. [*Id.* at 49:17-19; ECF 2178-1, p. 2]. By signing the form, Ms. Turner acknowledged that she "had not been threatened, nor forced in any way," and that she "freely consent[ed] to th[e] search." [ECF 2178-2].

In obtaining Ms. Turner's consent, the agents told her that she could refuse if she so desired. [*Id.* at 49:20-50:3]. They also told her, however, that if she did refuse, they would seek a warrant which "could take hours" and that she "could face eviction" if the search "causes an issue with your lease." [*Id.* at 11:21-12:11]. Ms. Turner described the tone of this part of the conversation as "very straight-faced." [*Id.* at 35:3-4]. It was "hey, this is what's going to happen, or this is what's going to happen." [*Id.* at 35:5-6].

At no point did Ms. Turner ever tell the agents that she wanted them to leave her apartment or to stop searching once they started. [*Id.* at 46:4-7]. While the agents were conducting the search, Ms. Turner engaged in polite conversation with Agent Embree about parenting and living in Monroeville.

[*Id.* at 16:3-4, 45:23-46:3]. When the search was over, Ms. Turner thanked Agent Embree. [*Id.* at 46:10-11]. The entire interaction (*i.e.*, from when the agents entered, obtained consent, searched the premises, and then left) lasted about 90 minutes. [ECF 2178-1, p. 3].

As a result of this search, numerous pieces of drug and non-drug evidence were seized and catalogued in the Report of Investigation that was drafted on January 14, 2020, including a sealed envelope addressed to Mr. Patton. [*Id.* at pp. 3-10; ECF 2178-3]. Mr. Burley now moves to suppress this evidence. Mr. Patton joins, seeking to specifically suppress the sealed envelope.

## LEGAL STANDARD

The government has the burden of proving, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005) (citation omitted). "At a hearing on a motion to suppress, it is the duty of the trial judge to assess witness credibility and determine the weight to be given the evidence, together with any inferences, deductions and conclusions to be drawn therefrom." *United States v. Balanquet-Herrera*, No. 14-278, 2016 WL 164543, at *13 (W.D. Pa. Jan. 14, 2016) (Fischer, J.) (citing *United States v. Richardson*, 501 F. Supp. 2d 724, 734 (W.D. Pa. 2007) (Gibson, J.)).

## DISCUSSION & ANALYSIS

**I.   The consent exception to the warrant requirement applies.**

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause[.]" U.S. Const. amend. IV.

Warrantless searches are "per se unreasonable, subject only to a few specifically established exceptions." *United States v. Ginyard*, No. 17-274, 2019 WL 257937, at *4 (W.D. Pa. Jan. 18, 2019) (Conti, J.) (cleaned up) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). One such exception is consent. "[T]he search of property, without warrant and without probable cause, but with proper consent voluntarily given, is valid under the Fourth Amendment." *United States v. Matlock*, 415 U.S. 164, 165-66 (1974).

The parties agree that Ms. Turner consented to the search of the apartment. [Hearing Tr. at 14:7-9 ("Q: [D]id you in fact consent to the search of the apartment? A: Yes.")]. She not only provided verbal consent; she also signed a written form memorializing that consent. [*Id.* at 14:10-12; ECF 2178-2]. The question presented by Mr. Burley's motion is whether that consent was valid.

Mr. Burley argues that Ms. Turner's consent was invalid for two reasons. First, Mr. Burley believes that the consent was involuntary because it was "made under duress and/or coercion." [ECF 1762, p. 5]. Second, Mr. Burley believes that Ms. Turner lacked the actual or apparent authority to consent to a search of his bedroom within their shared apartment. [*Id.* at p. 6]. After carefully considering the evidence presented to the Court, neither of Mr. Burley's arguments is ultimately persuasive.

### A. Ms. Turner's consent was not coerced or given under duress.

In determining voluntariness of consent, the Court considers the "totality of the circumstances, including the age, education, and intelligence of the subject; whether the subject was advised of his or her constitutional rights; the length of the encounter; the repetition or duration of the questioning; and the use of physical punishment." *United States v. Price*, 558 F.3d 270, 278 (3d

Cir. 2009) (citations omitted). "The setting in which the consent was obtained and the parties' verbal and non-verbal actions are also relevant considerations in determining the voluntariness of the consent." *Ginyard*, 2019 WL 257937, at *4 (cleaned up).

The Court finds Ms. Turner's testimony to be credible. But even crediting Ms. Turner's testimony as true and reliable, her testimony establishes that her consent was voluntary. Ms. Turner testified that although nervous on the inside, she was "calm" and "composed" on the outside. [Hearing Tr. at 30:6-7]. Agent Embree made a similar observation when he testified that, from his perspective, Ms. Turner "appeared to be very calm the entire time." [*Id.* at 45:23]. Ms. Turner testified that her conversations with the agents took place in her dining room from a "normal conversation distance"—the agents did not encroach on her physical space or physically restrain her at any time. [*Id.* at 14:23-15:1, 45:12-13]. The agents did not yell at her or threaten to arrest her. [*Id.* at 45:14-17].

After Ms. Turner gave her verbal consent, the agents took the time to also obtain her written consent. They provided her with a written form that they read to her before she signed it. [*Id.* at 26:18-21 ("Q: You would agree with me that one of the agents read the form to you before you signed it, correct? A: That I can recall, I believe that he did read it to me, yes.")]. That one-page form contained only three, easy-to-comprehend statements:

1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the person, places or things to be searched.)

2. I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.

3. I FREELY CONSENT TO THIS SEARCH.

[ECF 2178-2]. As a college graduate and business owner, Ms. Turner was more than capable of understanding the meaning and import of this form. Ms. Turner signed the form within approximately 10 to 15 minutes of the front door being opened. [Hearing Tr. at 49:17-19]. That timeframe does not suggest any kind of overmastering influence.

The agents at the scene also informed Ms. Turner that she could refuse consent if she so desired. [*Id.* at 49:20-50:3]. Despite being aware of that choice, at no point did Ms. Turner tell the agents that she wanted them to leave or ask that they stop searching the apartment. [*Id.* at 46:4-7].

Against that backdrop, Mr. Burley challenges the voluntariness of Ms. Turner's consent based on two aspects of the search: (1) that the agents entered the apartment with their guns drawn; and (2) that the agents told Ms. Turner that they would obtain a warrant if she did not consent, which could take hours and "could" cause her to be evicted. Neither aspect renders Ms. Turner's consent involuntary.

In his motion, Mr. Burley described the scene as follows: "Ms. Turner, having just woken up, came out of her bedroom to find officers with guns drawn, flashlights out and Mr. Burley in custody." [ECF 1762, p. 5]. Under these circumstances, Mr. Burley argues that Ms. Turner's decision "was not the product of free and unconstrained choice." [*Id.* at p. 6]. The Court disagrees. "Though certainly unpleasant, there is nothing so inherently coercive about such tactics, commonly used where a danger to life or limb is perceived by law enforcement agents, to render subsequent cooperation involuntary." *United States v. Contreras*, 820 F.3d 255, 270 (7th Cir. 2016) (citation omitted). The critical inquiry is whether after that initial necessary display of force to protect the safety of the law enforcement agents, the guns

remained drawn and trained on the person during questioning. There was no testimony or evidence that that was the case here.

To the contrary, Agent Embree testified that once the agents completed their protective sweep of the apartment, they "would have secured their weapons and not pointed them at anybody else in the house[.]" [Hearing Tr. at 68:14-16]. Consistent with that testimony, Ms. Turner did not testify that any agent pointed a weapon at her while she was being asked to consent to a search of the apartment or to otherwise threaten her. That kind of de-escalation removes any kind of coercive taint from the situation. *See, e.g.*, *United States v. Mendoza*, 334 F. App'x 515, 518 (3d Cir. 2009) (affirming finding of voluntary consent where officer "made an extreme show of force by drawing his weapon when he approached Mendoza's car" but where that weapon had "been holstered for several minutes by the time Mendoza gave his consent to the search of his vehicle"); *United States v. Kozinski,* 16 F.3d 795, 810 (7th Cir. 1994) (consent found voluntary where agents entered the defendant's home with an arrest warrant, one of the agents held a gun to the defendant's side for the first few minutes of the arrest, and the agent then holstered her gun after the defendant was handcuffed but before he provided written consent); *United States v. Scott*, 732 F.3d 910, 917 (8th Cir. 2013) ("The security sweep of the apartment, conducted by officers with guns drawn, was an understandable security measure considering the perpetrators of the Bank Midwest robbery were heavily armed. The security sweep ended before Agent Ramana interviewed Starnes and asked for her consent to search the Jaguar. The district court's finding that Starnes voluntarily consented was amply justified by the evidence.").

Likewise, Ms. Turner's consent was not rendered involuntary by the agents informing her in a "very straightforward," matter-of-fact tone that there

- 9 -

could be potential personal consequences if she refused to consent to the search. The agents told Ms. Turner that they planned to obtain a warrant if she did not consent, and that obtaining that warrant could take hours. [Hearing Tr. at 27:14-19]. Both statements were true, and the Court does not find the tone, wording, or context of those statements to be coercive.[2] "[W]hen [an] officer's expressed intention to obtain a warrant is genuine and not merely a pretext to induce submission, it does not vitiate consent to search." *United States v. Hicks*, 650 F.3d 1058, 1064 (7th Cir. 2011).

Here, the agents executing the protective sweep observed what they believed to be incriminating evidence in plain view. [ECF 2178-1, p. 2]. Based on that observed evidence and a reasonable belief that probable cause existed, the agents possessed a genuine intention to apply for a search warrant if Ms. Turner did not consent. *See* [Hearing Tr. at 59:12-17]. As a result, any discussion about the agents obtaining a search warrant did not coerce Ms. Turner's consent. *See, e.g.*, *United States v. Jones*, No. 13-252, 2016 WL 3067010, at *25 (W.D. Pa. June 1, 2016) (Conti, J.) ("[T]he suggestion to Jones that the officers would seek a search warrant if Jones did not consent was not coercive, or incorrect, under the circumstances[.]").

Ms. Turner's suggestion that the agents "implied that [she] could be evicted" if she did not consent to the search was similarly not coercive under

---

[2] The tone, wording, and context of these statements matter. Consider the statement, "if you don't consent, we are going to make sure you are evicted." Those words, particularly when spoken with a sharp tone, could be construed as a threat that may well be coercive. But as Ms. Turner testified, the agents here basically explained the consequences of obtaining a warrant in a straightforward way—*i.e.,* something akin to, "you can either consent, or if we get a warrant, you may end up getting evicted by your landlord." In this context, matter-of-factly explaining the practical consequences of a warrant, such that Ms. Turner could make an informed decision, is not coercive.

the circumstances. Express or implied statements about potential housing complications that may arise as the result of a search do not make a situation coercive. *See, e.g.*, *United States v. Lopez*, No. 17-238, 2019 WL 3812518, at *13-14 (D. Conn. Aug. 13, 2019) (rejecting argument that concern over the "personal catastrophe that would be eviction" supported a finding of coercion to consent to search); *United States v. Hampton*, No. 03-983, 2004 WL 2806337, at *1-2 (N.D. Ill. Dec. 3, 2004) (rejecting argument that "written consent was improperly obtained because, among other reasons, police officers wrongfully threatened White with eviction from her public housing"). That is especially true here because Ms. Turner testified that it was her own experience in "leasing"—and not anything the agents said about the specifics of her lease—that caused her to believe that eviction was a potential consequence of the agents' search of her apartment. [Hearing Tr. at 27:20-29:6].

Simply put, there are no circumstances that suggest that Ms. Turner's consent was given under duress or improperly coerced in any way. Considering the relative "brevity of this matter-of-fact exchange, the calmness of the atmosphere," the location of the interview, and "the absence of any fervent, resilient objections by [Ms. Turner]," the Court "cannot conclude that [Ms. Turner's] will was overborne by coercive police conduct such that [she] lost the capacity for self-determination." *Jones*, 2016 WL 3067010, at *25.

> **B. Ms. Turner had actual and apparent authority to consent to the search of Mr. Burley's bedroom.**

Mr. Burley next challenges Ms. Turner's consent by arguing that she lacked either actual or apparent authority to consent to a search of his private bedroom within the apartment.

If the person consenting to the search is not the target of the investigation, as is the case here, the government must not only establish that the consent was voluntary, but also that the third person had, or at least appeared to have, authority to agree to the search. *See United States v. Paige*, 543 F. App'x 218, 222 (3d Cir. 2013) (citation omitted).

A third party has "actual authority" to consent to a search of a residence where that party has "common authority" over the premises. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990) (citation omitted). "Common authority" rests not on "property rights but on mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Stabile*, 633 F.3d 219, 230-31 (3d Cir. 2011) (cleaned up). This joint access or control must make it "reasonable to recognize that any of the co-inhabitants has the right to permit inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Matlock*, 415 U.S. 164, 171 (1974).

"[C]ontrol for most purposes of property is a normative inquiry dependent upon whether the relationship between the defendant and the third party is the type which creates a presumption of control for most purposes over the property by the third party." *United States v. Rith*, 164 F.3d 1323, 1330 (10th Cir. 1999). "Relationships which give rise to a presumption of control of property include parent-child relationships and husband-wife relationships." *United States v. Price*, No. 07-310, 2008 WL 2900089, at *4 (W.D. Pa. July 24, 2008) (McVerry, J.) (quoting *Rith*, 164 F.3d at 1330). "[T]he presumption regarding a parent also applies to a stepparent." *United States v. Romero*, 749 F.3d 900, 906-08 (10th Cir. 2014) ("Stepparents are part of the family, and when they live with stepchildren they will necessarily share the intimacies of family life."). This presumption can be overcome by offering evidence that

establishes an exclusive right to the room (*i.e.*, regularly paying rent, an external lock on the door, an agreement that the third party never enter a particular area, etc.). *Rith*, 164 F.3d at 1331.

Ms. Turner had actual authority to consent to a search of the entire apartment, including Mr. Burley's bedroom. As Mr. Burley's stepmother, there is a presumption of control over his bedroom. Buttressing this presumption is the fact that Ms. Turner was the sole leaseholder of the apartment. *See* [Hearing Tr. at 47:4-6]. While there was a lock on the door, from the testimony given, the lock appears to have been part of a standard bedroom doorknob and did not require a key to unlock it. [*Id.* at 25:4-12]. In any case, Ms. Turner testified that Mr. Burley did not lock the door [*id.* at 25:6-7], and that if she wanted to "go in" Mr. Burley's room, she "could have" [*id.* at 34:5]. Mr. Burley was simply an adult child, living at home, who was afforded some degree of privacy. But, as Ms. Turner's testimony makes clear, as the leaseholder and parent, she had unfettered access to enter Mr. Burley's room.

Indeed, there was no formal agreement that Mr. Burley's room would remain private. Ms. Turner testified that she and Mr. Burley's mother "had that parent talk" during which they discussed that they would enter his room if he gave them a "reason" to enter. [*Id.* at 33:12-15]. Similarly, while Mr. Burley appears to have contributed rent, he only did so "informally" in different amounts and not necessarily every month. [*Id.* at 32:14-24]. These facts are not enough to overcome the presumption of access and control that Ms. Turner had over Mr. Burley's bedroom.

Even if Ms. Turner did not have actual authority, she had apparent authority to consent to the search. Law enforcement may enter private premises without a warrant so long as they have received consent from a person whom they reasonably believe has common authority over the premises.

*Rodriguez*, 497 U.S. at 177. The reasonableness of such decisions must be determined under the totality of the circumstances. *United States v. Ladell*, 127 F.3d 622, 624 (7th Cir. 1997). Based on the totality of the circumstances, it was reasonable for the agents to believe that Ms. Turner had authority to consent to a search of the entire apartment.

Again, Ms. Turner was the sole leaseholder. *See* [ECF 2178-1, p. 2]. According to Agent Embree, it appeared "as though Mr. Burley and his mother lived there with her as opposed to her living there with them or something along those lines." [Hearing Tr. at 47:16-19]. Ms. Turner told the agents that there was no room that was "off limits" to her. [*Id.* at 48:2-4; ECF 2178-1, p. 2]. These are all facts that would lead a reasonable person to believe that Ms. Turner had control over and access to the entire apartment.

Mr. Burley's reliance on the non-binding case of *United States v. Whitfield*, 939 F.2d 1071 (D.C. Cir. 1991) is misplaced. [ECF 1762, pp. 7-8]. In *Whitfield*, there was no evidence that the mother said, as Ms. Turner did here, that no room was "off limits," that she could go into Mr. Burley's room if she wanted, and that she and Mr. Burley's mother had previously told him that they would enter his room "if he gave them a reason to." Thus, unlike the mother in *Whitfield*, Ms. Turner could enter any room in the apartment whenever she wanted—a critical difference between this case and that one. *See United States v. Casey*, 825 F.3d 1, 16 (1st Cir. 2016) (distinguishing *Whitfield* and finding grandparents had authority to consent to search of grandson's bedroom where the grandmother said she "could enter the room 'at will,'" and the grandfather said that he "'ordered people around' at the house and 'had free access to the room at all times'").[3]

---

[3] Separately, in *Whitfield*, the court there required proof of both mutual use and joint access in order for the third party to have authority to consent to a

In sum, Ms. Turner's consent was valid, and the search of Mr. Burley's bedroom was lawful.[4]

## II. A violation here would not require suppression in any event.

Finally, the government argues that even if Ms. Turner's consent were invalid for any reason, the exclusionary rule should not be applied to the evidence seized from Mr. Burley's bedroom. [ECF 1879, p. 35]. The Court agrees.

The purpose of the exclusionary rule is to deter further Fourth Amendment violations. But "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." *Davis v. United States*, 550 U.S. 229, 238 (2011) (cleaned up). As clarified by the Third Circuit, the key test is "whether a reasonably well trained officer would have known that the questionable search was illegal." *United States v. Katzin*, 769 F.3d 163, 177 (3d Cir. 2014) (citation omitted). That is because in the context of suppression, "the Supreme Court has unequivocally held that deterring isolated negligence is not worth the social cost of excluded evidence." *United States v. Wright*, 777 F.3d 635, 641-42 (3d Cir. 2015) (citation omitted).

---

search. 939 F.2d at 1071, 1074. The Court is unaware of, and Mr. Burley has not cited, any Third Circuit case applying the more-stringent *Whitfield* standard. The Third Circuit has explained that "a third party lacks authority to consent to a search of an area in which the target of the search has not relinquished his privacy." *Stabile*, 633 F.3d at 232. Under the circumstances described by Ms. Turner, Mr. Burley did relinquish his privacy to his mother and stepmother.

[4] Because the Court finds that Ms. Turner's consent to search was valid, the Court need not, and does not, address the government's inevitable discovery argument. [ECF 1879, pp. 32-35].

Under the circumstances of this case, suppression would not be warranted. The agents explained to Ms. Turner that she could refuse to consent to the search. They read the consent form to her and provided her adequate time to review it herself before she signed. Ms. Turner's outward appearance was calm at all times, as she admits. [Hearing Tr. at 30:4-7]. This situation did not have the hallmarks of coercion. It was reasonable for the agents to believe her consent was voluntary.

Additionally, as discussed above, based on Ms. Turner's statements, the agents reasonably believed that she had authority to consent to the search of Mr. Burley's bedroom. If the agents were mistaken about Ms. Turner's authority over the apartment, that mistake of fact was reasonable. *See Balanquet-Herrera*, 2016 WL 164543, at \*13 (finding that mistake of fact regarding authority to consent to search would not warrant suppression under the exclusionary rule).

The exclusionary rule is only to be applied as a "last resort." *Herring v. United States*, 555 U.S. 135, 140 (2009) (cleaned up). To trigger it, "police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144. Even if the agents had made an error in this case, it would not be the type that rises to the level of requiring suppression.[5]

---

[5] Because the Court will deny Mr. Burley's motion, it need not decide the issue of Mr. Patton's standing, and therefore assumes he has standing for purposes of deciding this motion. That said, the Court has serious doubts about whether Mr. Patton could have joined in Mr. Burley's motion. Mr. Patton bases his entire argument on the fact that an envelope that was addressed to him was included in the evidence seized during the search of Mr. Burley's room. Mr. Patton contends that he has a reasonable expectation in sealed mail that is addressed to him, and that expectation gives him the right to challenge the search of Mr. Burley's room. [ECF 2088, p. 3]. The Court sees at least three

## **CONCLUSION**

After carefully considering the record and the relevant legal authorities, the Court finds that the motion to suppress filed by Mr. Burley [ECF 1761] and joined by Mr. Patton will be DENIED. An appropriate order consistent with this memorandum opinion will follow.

DATED this 23rd day of July, 2020.

BY THE COURT:

*/s/ J. Nicholas Ranjan*
United States District Judge

---

potential problems with Mr. Patton's argument. First, the envelope was not technically mail yet. It was found in Mr. Burley's bedroom before he placed it into the mail. As such, the envelope is more akin to a sealed container than a piece of mail. Second, Mr. Patton's argument does not address the fact that at the time of the search, he was incarcerated. The Fourth Amendment rights of prisoners are "limited." *See United States v. Solomon*, No. 05-385, 2007 WL 1099097, at *3 n.2 (W.D. Pa. Apr. 11, 2007) (McVerry, J.) (citations omitted). A prisoner's mail is often opened and reviewed by prison officials before they deliver it. Thus, it is not clear to the Court that Mr. Patton's purported expectation of privacy would apply, even if the envelope is considered sealed mail. Third, the suppression motion concerned consent to search an apartment where Mr. Patton did not reside. Even if Mr. Patton had a reasonable expectation of privacy in the mail found in the apartment, the key inquiry is whether he had a reasonable expectation of privacy in the apartment itself.